U.S. WOLFSON BROS. CORP. v. UNITED STATES (No. 5178)*

---

*C.A.D. 856.

United States Court of Customs and Patent Appeals, May 6, 1965

*James R. Sharp, Myron Solter, Sharp & Bogan, Glickstein, Orenshaw, Glickstein & Hulsey,* for appellant.

*John W. Douglas,* Assistant Attorney General, *Andrew P. Vance,* Chief, Customs Section, *James S. O'Kelly,* for the United States.

[Oral argument April 5, 1965 by Mr. Solter and Mr. Vance]

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND, Jr., Associate Judges

RICH, Judge, delivered the opinion of the court:

This ■ appeal is from the judgment of the United States Customs Court, Third Division (52 Cust. Ct. 86, C.D. 2442), overruling the importer's protest to the imposition of 10% ad valorem additional duty under section 304 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, for failure to mark the merchandise in accordance with law to indicate the country of origin.

The merchandise consisted of steel tubular bends or welding fittings of various sizes.[1] There were 200 pieces greater than 6 inches in diameter, imported loose and not individually marked, and 10,105 pieces ranging in size from 2½ to 6 inches in diameter, contained in 1,332 burlap bags, each bag having a 2 x 5 inch tag attached to it printed with the words "Made in Scotland." The pieces in the bags were not individually marked.

The pertinent provisions of the Tariff Act, as amended, are as follows, all emphasis being ours:

SEC. 304. MARKING OF IMPORTED ARTICLES AND CONTAINERS.

(a) *Marketing of articles.*—Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such

---

[1] It is stipulated that the imported fittings are similar to the merchandise involved in *Moller and U.S. Wolfson Bros. Corp.* v. *United States,* 46 CCPA 89, C.A.D. 704, which held the merchandise to be dutiable as steel elbows or bends under paragraph 397 of the Tariff Act of 1930, as modified.

manner *as to indicate to an ultimate purchaser* in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

\* \* \* \* \* \* \*

(3) Authorize the exception of any article from the requirements of marking if—

\* \* \* \* \* \* \*

(D) The marking of a container of such article will reasonably indicate the origin of such article;

\* \* \* \* \* \* \*

(b) *Marking of containers.*—Whenever an article is expected under subdivision (3) of subsection (a) of this section from the requirements of marking, the immediate container, if any, of such article, or such other container or containers of such article as may be prescribed by the Secretary of the Treasury, *shall be marked in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of such article*, subject to all provisions of this section, including the same exceptions as are applicable to articles under subdivision (3) of subsection (a). \* \* \*

(c) *Additional duties for failure to mark.*—If at the time of importation any article (or its container, as provided in subsection (b) hereof) is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article (or its container, as provided in subsection (b) hereof) marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), *there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem*, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause. \* \* \*

Pursuant to section 304(a)(3)(D) of the Tariff Act as amended, the Secretary promulgated Customs Regulation 11.10 which states in part:

11.10 *Exceptions to marking requirements.*—(*a*) Articles within any specification in section 304(a)(3), Tariff Act of 1930, as amended, are hereby excepted from the requirement of marking. The marking of the container of an article will reasonably indicate the origin of such article within the meaning of section 304(a)(3)(D) if the article is imported \* \* \* in a container which will reach the ultimate purchaser in the United States unopened. \* \* \*

The principal issue is whether the fittings were marked in compliance with the statute at the time of importation.

With respect to the 200 large fittings, they were not marked and they were not in containers. As to them appellant does not contend that the marking statute was complied with. They are involved on this appeal only with respect to arguments relating to an alleged excuse and an alleged exception which we shall consider later.

With respect to all the other fittings, the argument is that the tags attached to the burlap bags constituted sufficient marking.

In *United States* v. *Friedlaender & Co., Inc.*, 27 CCPA 297, C.A.D. 104, this court said (p. 302):

As we see it, Congress intended that the *ultimate purchaser* should be able to know *by an inspection of the marking* on imported goods the country of which the goods is the product. The evident purpose is to mark the goods so that *at the time of purchase* the *ultimate purchaser* may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such markings should influence his will. [Emphasis ours.]

The goods themselves not having been marked in any instance, the decision on the adequacy of marking issue necessarily turns on whether the marking on the bags, as imported, was a sufficient compliance with the statute. This in turn depends on whether that marking reached or was such as to reach the ultimate purchaser.

Both parties took testimony. It shows that the principal users, or ultimate purchasers, of the imported fittings were shipyards, where the fittings were incorporated into piping systems, or fabricators of piping systems for the petroleum industry. The question is whether the "Made in Scotland" tag markings on the burlap bags in which the fittings were imported got through to ultimate purchasers. Quite clearly the evidence shows that in large part they did not. Quite probably, as the Customs Court found, they sometimes did. But there is no way to tell from the record what part of the imported goods got through to ultimate purchasers in the original bags in which they were imported. The factual situation as the lower court saw it was this:

As to certain of plaintiff's customers, there is failure of proof as to whether such customer was, in fact, an ultimate purchaser. It is apparent that some were. Some were not. As to some customers, while there is uncontradicted testimony that they themselves used the tubes [bends] and, hence, may be deemed ultimate purchasers, there is failure of proof as to the number of pieces, kind, and value of the merchandise of this entry which those customers purchased. In some instances, at least, there is failure also of proof that merchandise sold to ultimate purchasers was in containers that were properly marked, or indeed in any containers.

Not only was there "failure to proof" as noted in the lower court's opinion, but there was also much positive evidence that plaintiff sold the fittings in large quantity without markings showing country of origin to other than an ultimate purchaser which, in turn, resold, without markings, and that many such fittings were resold once or twice more. The Government's brief includes the following passages which, so far as we are able to see, are fully supported by the record and which we do not find anywhere contradicted in appellant's brief:

Appellant's witness Schemer testified that 75 per cent of the merchandise in question was sold to the Heat & Power Corp. * * * The uncontradicted testimony of Mr. Zink, Sr., however, established that the Heat & Power Corp. received the merchandise without any identifying marks or tags to indicate its country

of origin. Further his testimony established that Heat & Power Corp. resold 60 percent of the merchandise to other users, and that upon such resale the merchandise was not marked so as to identify its origin. * * * Thus, the evidence established that not only was 75 per cent of the merchandise sold *without* any marks either on the articles themselves or their containers to indicate the country of origin, but also that the Heat & Power Corp. was not the ultimate purchaser as to a great part of the 75 per cent, as claimed by appellant. See *United States* v. *Gibson-Thomsen Co., Inc.*, 27 CCPA 267, C.A.D. 98.

With respect to the shipment of fittings by appellant at Heat & Power Corp.'s order to Tulsa, Oklahoma, for the Tube Turns, Inc., the uncontradicted testimony of witnesses Tyler, * * * Parkhurst, * * * and Barr * * * established that the merchandise arrived in Tulsa in burlap bags *and boxes*, none of which were marked to indicate the country of origin of the contents. Moreover, their testimony proved that Tube Turns, Inc., was not the ultimate purchaser of the merchandise, but reshipped it to Houston, Texas, again without any markings to indicate the country of origin.

The shipment that went to Tube Turns, Inc., in Tulsa, Oklahoma, is covered by two bills of lading in evidence as Exhibits D and E. The former shows the quantities to be "864 Bags Steel Pipe Fittings" and "182 Loose Ditto" while the latter covers "469 Bags Iron or Steel Pipe Fittings," "7 Boxes" of same and "520 Pcs" of same. These are the fittings the witnesses Tyler, Parkhurst and Barr testified they received, handled, and warehoused which bore no markings showing the country of origin.

Appellant complains that the court below "erred egregiously in holding appellant to proof of marking of the merchandise at the time of delivery to ultimate purchasers, and in ignoring uncontroverted evidence that the merchandise was lawfully marked at the time of its importation." This complaint is entirely unjustified. The marking at the time of importation was in compliance with the statute only if it was such that, under normal conditions in the trade in which this merchandise moved, it would reach substantially all ultimate purchasers, not just some of them. The evidence conclusively shows that in large part it would not and did not do that. Therefore, *at the time it was imported* it was *not* so marked as to comply with the statute.

Appellant's second point is based on the lapse of time between the importation of the fittings and the notification of the importer by the Collector of the contemplated assessment of marking duties. This time interval was eleven months. The facts are contained in three paragraphs of a stipulation:

5. The merchandise covered by Entry No. J–187 was imported * * * October 28, 1951. Examination of the merchandise was made on October 29, 1951 and the examination packages released on the same day. The non-examination packages were released from Customs' custody on November 2, 1951 with no exceptions as to the quantity.

6. On September 9, 1952, Customs Form No. 4647, Marking Notice with respect to said entry, was mailed by the Appraiser of Merchandise, acting for the

Collector, to Herbert B. Moller the importer of record. This notice required the importer, within 30 days from date of the notice, to redeliver to the Collector of Customs at Jacksonville, Florida, all of the merchandise covered by Entry No. J–187, which was not legally marked.

7. As of September 15, 1952, all merchandise covered by Entry J–187 was found not to be in stock of the importer by Customs employees and, therefore, not available for redelivery to the Collector.

Appellant claims that "The ▇ failure of the Collector to notify appellant of contemplated assessment of marking duties until long after the merchandise had gone into consumption deprived appellant of its statutory right to avoid marking duty by marking under customs supervision and thus voids the duty assessment." The lower court held that "Congress has given this court no authority to direct the remission of marking duties on such a ground." The Government cites section 304(c) in part, which says that the marking duty "shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable *for any cause*." (Emphasis ours.) Cases cited are *A. N. Deringer, Inc.* v. *United States*, 51 Cust. Ct. 21, C.D. 2408, and *Freedman & Slater, Inc.* v. *United States*, 32 Cust. Ct. 325, C.D. 1621.

We agree with the Customs Court's decision that the delay in sending the notice is not, under the law, a ground on which the marking duty can be avoided.

Appellant's final point is that the merchandise comes within the exemption of section 304(a)(3)(J). We agree with the Government that this ▇ issue is not before us because (1) no claim under this section was made in the protest; (2) no evidence to support it was introduced at the trial; (3) the Customs Court never considered such a claim; and (4) no such question is raised by the assignment of errors. We agree that we cannot consider the issue.

As we find no merit in any of the appellant's points on appeal, the judgment below is *affirmed*.